IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CATHERINE H.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 7:17-cv-484 |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Catherine H. ("Catherine"), proceeding pro se, filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Catherine alleges that the Administrative Law Judge ("ALJ") erred by finding that she was not disabled and failing to award benefits. I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 14).

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Catherine failed to demonstrate that she was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability

1

evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## **CLAIM HISTORY**

Catherine filed for DIB on December 3, 2013, claiming disability due to manic bipolar with psychosis, blindness in the left eye, and underweight, with an alleged onset date of October 14, 2008. R. 87. Catherine was 47 years old when she applied for DIB, making her 42 years old on her alleged onset date. Id. Catherine's date last insured was December 31, 2010; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive DIB. Id.; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).[3] The state agency denied Catherine's applications at the initial and reconsideration levels of administrative review. R. 87–112. On August 31, 2016, ALJ Thomas W. Erwin held a hearing to consider Catherine's claims for DIB. R. 37–86. Counsel represented Catherine at the hearing, which included testimony from Catherine's case manager, Julie LaFountain, and vocational expert Mark Hileman. R. 37. On October 20, 2016, the ALJ entered his decision analyzing Catherine's claims under the familiar five-step process[4] and denying her

---

under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] Catherine was awarded Supplemental Security Income (SSI) on December 5, 2013. R. 18. She was found to be disabled after the date last insured, however, entitling her only to SSI benefits. Id.

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the

claim for DIB. R. 18–31.

The ALJ found that Catherine did not engage in substantial gainful activity from October 14, 2008, the alleged onset date, through December 31, 2010, her date last insured. R. 20. The ALJ determined that Catherine suffered from the severe impairments of bipolar disorder with psychotic features, degenerative disc disease, and vision loss. R. 20–21. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment, specifically listings 1.04 (disorders of the spine), 2.02 (impairment of visual acuity), 2.03 (contraction of visual field), 2.04 (loss of visual efficiency), 12.03 (schizophrenia spectrum and other psychotic disorders), or 12.04 (depressive, bipolar, and related disorders). R. 21–23. The ALJ also considered the "paragraph B" criteria and determined that they were not satisfied. R. 21–22. The ALJ found that Catherine had moderate restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and no episodes of decompensation during the relevant period.[5] R. 22. The ALJ determined that the "paragraph C" criteria were also not satisfied. R. 22–23.

The ALJ concluded that Catherine retained the residual functional capacity ("RFC") to perform light work with limitations. R. 23. For exertional limitations, Catherine could only occasionally crawl and climb, and she had no postural limitations. Id. Regarding environmental limitations, Catherine could have no exposure to hazards. Id. The ALJ determined that Catherine

---

requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[5] The ALJ recognized that Catherine had episodes of decompensation before the alleged onset date and after the date last insured. R. 22.

3

can perform simple, unskilled tasks, which allow for regularly scheduled breaks and do not require more than occasional changes in her work setting. Id. Catherine can only have occasional interaction with the public, coworkers, and supervisors. Id.

The ALJ determined that Catherine would not be able to perform her past relevant work as a waitress or fast food worker. R. 29. Based on her age, education, work experience, and RFC, the ALJ determined that Catherine could perform jobs that exist in significant numbers in the national economy, such as housekeeper, clothing bagger, and marker. R. 29–30. Thus, the ALJ concluded that Catherine was not disabled. R. 30–31. Catherine appealed the ALJ's decision and the Appeals Council denied her request for review on August 23, 2017. R. 1–4.

## ANALYSIS

Catherine alleges that the ALJ wrongly determined that she was not disabled, and urges that she be awarded benefits. The Commissioner argues that substantial evidence supports the ALJ's decision and his RFC assessment.

**A. Medical History**

1. Physical Impairments

In her January 2014 pain report, Catherine reported constant pain in her neck and middle back due to slipped discs. R. 233. The medical records show that Catherine had been seeing a chiropractor monthly since at least December 2007 until February 2012 for cervical spine conditions. R. 615, 643. For the period at issue, from October 2008 to December 2010, Catherine's condition remained largely consistent, with the exception of some episodic lower back issues that resolved within weeks. Catherine regularly reported substantial improvement and decreased pain in her neck (R. 620–22); improvement with left shoulder and arm pain (R. 620–22); and improvement with upper back pain (R. 638–40). She had two episodes of acute

4

severe lower back pain in January 2009 and September 2010, but each instance lasted only for a couple of weeks. R. 622–31, 634–40. Outside of those episodes, her complaints were mainly for mild upper back pain (R. 631–33, 635); intermittent or mild lower back pain (R. 631–34); and mild to moderate intermittent neck pain (R. 633–35, 638–40). There are no records indicating Catherine received medical treatment or evaluations for her back pain.

Catherine testified to being totally blind in her left eye and needing glasses to help her vision in her right eye. R. 54. She testified that her right eye waters a lot, and she has no depth perception or peripheral vision. Id. The vision care records extend from January 2007 to November 2012 and show that her visual condition was consistent. Catherine had regular follow-up appointments for glaucoma, including during the period at issue. At each visit, Catherine reported no changes and no pain, and her doctor noted that her vision was stable, taking into account the corrective lens for her right eye. R. 653–65.

Catherine testified that she could no longer work beginning in 2008 because, as an administrative assistant, her neck and shoulder pain prevented her from typing and talking on the phone. R. 67. In her January 2014 function report, Catherine reported no problems with personal care. R. 236. She was able to prepare simple meals, do laundry, wash dishes, drive, go shopping, and handle money. R. 237–38. Her daily activities included reading and watching TV. R. 239.

2. Mental Impairments

In November 2007, Catherine was admitted to an inpatient psychiatric facility after a psychotic episode and put on medication for bipolar disorder and psychosis R. 717–28. Catherine underwent a psychiatric evaluation at Blue Ridge Behavioral Health in December 2007 to establish treatment for her shizoaffective bipolar disorder. R. 1359. Catherine received individual counseling and had regular medication management appointments. Her doctors stated that she

5

was stable throughout 2008, and noted that Catherine finished her accounting degree in May 2008. R. 1361–70. In October 2008, at a counseling appointment, Catherine reported having no psychotic episodes and that she applied for a waitressing job. R. 1372. Between October and December 2008, her doctors reported that Catherine was stable on her medication. R. 1372–73.

Throughout Catherine's appointments in 2009, her providers reported at each appointment that Catherine was stabilized on her medications, and that she did not report any problems. R. 1397, 1402, 1404, 1409, 1411, 1416, 1420, 1423. In January 2010, Catherine reported again that she was stable on medication. R. 1375. Her doctor noted that Catherine had been "very stable for the past year." R. 1376. Her doctor elaborated that Catherine had a stable mood, no mania or paranoia, no psychosis, no depression, and was consistent with her medication and compliant with her treatment plan. Id. Her doctor even stated that she would transition Catherine to being a "follow along client," as Catherine was "so stable that she [did] not need to have case management or therapy." R. 1378. At a medication follow up in April 2010, her doctor noted that Catherine was still stabilized on medication. R. 1381. Catherine appeared somewhat anxious at that appointment, but she was not having any mania or psychosis. Id. Her last appointment that year was in July 2010, where her doctor again reported Catherine was stabilized on her medication. R. 1385. Catherine reported some additional anxiety and depression, so her doctor started her on an anti-depressant. Id. In January 2011, Catherine was still stable on her medication and not having issues, including with the anti-depressant. R. 1426.

In February 2011, Catherine was admitted to the hospital for serious complications from pneumonia. R. 314, Ex. 4F. After her hospital stay, her medication maintenance doctors reported that Catherine continued to be stable on medication, including after some adjustments. R. 1009, 1014, 1020. Towards the end of 2011 and into 2012, Catherine started to have anxiety and

6

depression difficulties, but she was not manic or psychotic. R. 1025, 1031, 1039, 1044–45. Catherine was admitted to an inpatient psychiatric facility from October to November 2012 for manic episodes. R. 691–711, 732–78, 779–831. She was then admitted a second time in late November 2012. R. 871. Catherine had at least two more admissions for mania and psychosis in November 2013 (R. 882–84), and April to June 2014 (R. 1057–91).

In her January 2014 function report, Catherine stated she was able to pay attention for "as long as needed." R. 240. She stated she could follow written and spoken instructions well, and got along with authority figures. R. 240–41. She was not able to handle stress or changes in routine well. R. 241. At the hearing in 2016, Catherine testified that she fell into a depressive state in 2008 after being let go from her job. R. 67–68. She testified that she still experiences manic stages and deep depression, but she was taking her medications as directed. R. 52–53. Catherine testified to not having concentration issues around the 2008 time period. R. 63–64.

3. Medical Opinion Evidence

The record contains reports from two consultative examinations performed for a prior disability claim. William Humphries, M.D., performed the first exam in May 2007. Dr. Humphries diagnosed Catherine as having diminished visual acuity bilaterally with apparent blindness in the left eye, degenerative joint disease and degenerative disc disease in the cervical spine with ongoing cervical strain, and possible mild degenerative joint disease in the right knee. R. 298. Dr. Humphries reported that Catherine had seen a chiropractor for years for her neck and the pain had mostly resolved in the month prior to the examination. Id. The range of motion in her neck was slightly reduced and had mild tenderness. R. 296–97. Dr. Humphries reported Catherine's glaucoma in her right eye, for which she took medication and used a contact lens. R. 298. He also noted a knee injury from four years prior for which she continued to have some

7

issues.

R. 296. Dr. Humphries described Catherine as alert and not in distress, and she was able to answer questions appropriately and cooperate for the exam. Id. Catherine's speech was intelligible, her behavior was appropriate, her thought and intelligence were normal, her memory was intact, and her affect and grooming were appropriate. R. 298. Dr. Humphries ultimately concluded that Catherine would be limited to sitting, standing, and walking each for six hours in an eight-hour workday; lifting twenty-five pounds occasionally and ten pounds frequently; occasionally climbing and crawling; and avoiding all hazards. R. 299.

Dr. Humphries again examined Catherine in November 2010, right before the date last insured. In connection with this exam, imaging studies showed that Catherine had degenerative disc disease with spondylosis at C5-C6. R. 301. Dr. Humphries diagnosed left eye blindness; diminished vision in the right eye secondary to glaucoma; chronic cervical, thoracic, and lumbar strain with cervical degenerative joint/degenerative disc disease; degenerative joint disease in the right knee; mild degenerative joint disease in both feet; and hypertension. R. 305. Catherine again had mildly reduced range of motion in her neck and back with some tenderness. R. 304. Dr. Humphries reported Catherine's corrected vision to be 20/70, and she was able to count fingers fourteen inches away with her corrective lens. Id. Dr. Humphries reported Catherine's bipolar and schizophrenia. R. 302. Dr. Humphries described Catherine as alert, pleasant, not in distress, cooperative, and oriented, with intelligible speech, normal thought content and memory, appropriate grooming, and a slightly flat affect. R. 303–04. Dr. Humphries concluded that Catherine would be able to sit, stand, and walk each for six hours in an eight-hour workday; able to lift twenty-five pounds occasionally and ten pounds frequently; limited to no climbing, kneeling, or crawling, and occasional stooping and crouching; and to avoid hazards. R. 305–06.

In March 2014, as part of the state agency's initial disability determination, Howard S. Leizer, Ph.D., completed a psychiatric evaluation. Dr. Leizer determined that Catherine's medically determinable impairments included schizophrenia and other psychotic disorders. R. 91–92. Dr. Leizer considered listings 12.03 (schizophrenic, paranoid, and other psychotic disorders) and 12.04 (affective disorders), and determined that the "paragraph B" criteria were not met. R. 92. He determined that Catherine had a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. Id. Dr. Leizer determined that the "paragraph C" criteria were also not met. Id.

As part of his evaluation of Catherine's mental RFC on the date last insured, Dr. Leizer determined that, as of the date last insured, Catherine had no understanding and memory limitations. He found that she had sustained concentration and persistence limitations, specifically that she is moderately limited in her abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods. R. 93–94. Dr. Leizer also found social interaction limitations, namely, that Catherine is moderately limited in her abilities to: interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. R. 93. Dr. Leizer determined that Catherine's adaptation limitations included moderate limitation in her ability to respond appropriately to changes in the work setting. R. 94.

9

As part of Catherine's request for reconsideration of the state agency's disability determination, Dr. Jack Hutcheson, M.D., evaluated the records in August 2014. Dr. Hutcheson determined that Catherine had severe physical impairments, specifically spine disorders and loss of central visual acuity, in addition to her severe schizophrenia and other psychotic disorders. R. 104. In evaluating Catherine for her physical RFC, Dr. Hutcheson determined that Catherine's exertional limitations included lifting or carrying twenty pounds occasionally and ten pounds frequently, and standing or walking and sitting for six hours in an eight-hour workday with normal breaks. R. 106. For postural limitations, Dr. Hutcheson determined Catherine can never climb ladders, ropes, or scaffolds; frequently climb ramps/stairs, stoop, kneel, crouch, and crawl; and balance without limitation. Id. Catherine's visual limitations included limited near acuity, far acuity, depth perception, accommodation, and color vision in the left eye. R. 107. Her field of vision was unlimited. Id. Dr. Hutcheson determined Catherine should avoid moderate exposure to all hazards. R. 108. He determined she had no manipulative or communicative limitations. R. 106–07. Dr. Hutcheson concluded that Catherine was capable of light work. R. 111.

During that same reconsideration, Dr. Richard J. Milan, M.D., also considered listings 12.03 and 12.04, made the same "paragraph B" findings, and determined that the "paragraph C" criteria were not met. R. 104. Dr. Milan explained that the evidence prior to Catherine's date last insured "shows the claimant's symptoms to be adequately managed with outpatient psychiatric treatment." Id. He determined that Catherine was not psychotic, suicidal, or homicidal. Id. He also observed that Catherine was awake, alert, social, communicating without difficulty, had a stable mood, and reported that things were "going well" for her. Id. Dr. Milan made an identical mental RFC determination and concurred with Dr. Leizer's initial conclusion that Catherine is capable of performing simple unskilled work. R. 109.

10

**B. RFC Determination**

In her brief, Catherine argues that the filings in her case are flawed and describes why she stopped working, her mental health prognosis, the effects of her vision difficulties, and her admissions to psychiatric facilities. Pl.'s Br. at 1–2, Dkt. 13. She asks for full disability and backpay from October 2008. Id. at 2. Because Catherine is proceeding pro se, I will liberally construe her brief as a general challenge to the ALJ's determination of Catherine's RFC finding. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Catherine also challenges her date last insured of December 31, 2010. Pl.'s Br. at 1, Dkt. 13. A claimant must show that her disability began on or before her date last insured and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The ALJ determined that Catherine's earnings records demonstrated that she had acquired sufficient quarters of coverage to remain insured through December 31, 2010, citing $210,000 in revenue from a business she managed through 2010. R. 18, 20. This same date was noted on her initial and reconsideration applications, and Catherine's original counsel agreed to this date at the administrative hearing. R. 40, 46, 87, 99. Catherine has presented no evidence to suggest a different date, and it is not for this Court to re-evaluate her earnings and the date last insured. Thus, I find that substantial evidence supports the ALJ's determination of December 31, 2010, as Catherine's date last insured.

Turning to the RFC finding, an RFC is the most a claimant can still do despite her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Commissioner determines the RFC based on all of the relevant evidence in the claimant's record, and it must reflect the combined limiting effects of impairment supported by the medical evidence or the claimant's credible complaints. See Mascio v. Colvin, 780 F.3d 632, 638–40 (4th

Cir. 2015). SSR 96-8p requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Specifically, the ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). In Mascio v. Colvin, the court agreed with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" 780 F.3d 632, 636 (4th Cir. 2015) (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Catherine does not allege any specific errors in the ALJ's RFC, instead contending generally that she was unable to work beginning in October 2008. However, I find that substantial evidence supports the ALJ's RFC finding. The ALJ discussed Catherine's testimony and allegations of impairment (R. 23–24); the medical evidence of record regarding Catherine's mental health treatment, including evidence from before the alleged onset date (beginning in 2007) and after the date last insured (ending in 2014) (R. 24–26); and the weight assigned to each medical opinion, including those from Catherine's case manager, consultative examinations, and state agency consultants (R. 26–28). The ALJ then provided a comprehensive symptom analysis, in which connected specific evidence to his conclusions. R. 28–29.

For Catherine's neck and back pain, the ALJ properly observed that Catherine went to a

12

chiropractor occasionally but did not seek regular medical treatment from a doctor, nor was she referred to a surgeon or pain management specialist. R. 29. Despite that, the ALJ found that Catherine would be limited to light work during that time with some additional limitations. Regarding her vision impairment, the ALJ explained that, just prior to her date last insured, Catherine had a number of jobs that required some detailed skills, such as managing her business or doing office work. R. 28. Shortly before the alleged onset date, Catherine graduated from college. Id. The ALJ also observed that her activities, like watching TV and reading, require decent eyesight, and so despite Catherine's blindness in her left eye, she still had vision in her right eye. Id. The ALJ explained that the medical records show that Catherine's treating eye doctors continued with the same routine treatment for her glaucoma and noted her corrected vision in her right eye. R. 29. In light of her stable vision demonstrated by her records, the ALJ concluded that Catherine's vision issues did not render her disabled during that time period. I find that substantial evidence supports this determination. Regardless, the ALJ accounted for Catherine's vision deficiencies by finding that she should never be exposed to hazards.

In terms of Catherine's mental impairments, the ALJ explained that Catherine's treating practitioners did not note significant mental symptoms impairing her ability to work. He observed that her treating doctors reported Catherine's mental status as normal at most of her appointments, and she generally had normal insight, judgment, concentration, memory, mood, and affect. Id. The ALJ explained that Catherine was on medication for her allegedly disabling conditions, but the treatment was routine and "generally successful in controlling those symptoms." R. 28–29. The ALJ accurately stated that, from 2008 to 2011, Catherine needed only outpatient care for medication management, and at these appointments, Catherine "consistently reported that she had stable moods and no significant symptoms." R. 29. Catherine herself told

her doctors that her medications were working. Id. The ALJ ultimately concluded:

> In this case, the claimant has not consistently complained of symptoms relating to her alleged impairments. The claimant usually reported her symptoms were stable and sought no additional treatment other than her routine follow-up appointments. Though not dispositive of the case, such failure is a factor in analyzing the credibility of claimant's allegations. R. 29.

Regarding the opinion evidence, the ALJ gave very little weight to Catherine's social worker who testified at the hearing because she did not meet Catherine until three years after her date last insured and did not offer any evidence regarding Catherine's functionality during the relevant period. R. 26. The ALJ accorded both of the consultative examiner's opinions, particularly the 2010 opinion, significant weight because the 2010 exam was performed after the alleged onset date but before the date last insured. R. 27. The ALJ explained how that opinion was consistent with the medical evidence because it demonstrated that Catherine could see with her right eye despite her left eye blindness; had a normal mental status examination; and had only mild physical abnormalities. Id. The ALJ also gave the state agency physicians' opinions some weight, explaining that their opinions were mostly consistent with the record. Id.

Finally, in his "step three" evaluation, the ALJ explained that, while Catherine had moderate impairment in three functional areas, her difficulties were well-controlled, and even absent, between the alleged onset date and the date last insured. For activities of daily living, the ALJ explained that in her self-reports, Catherine did not allege significant difficulties in daily functioning and had just completed her college degree, followed by many jobs. R. 22. Likewise, during the relevant period, the record evidence demonstrates little or no significant symptoms affecting her social functioning. Id. Catherine was able to continue running her business and her treating sources did not observe any deficits in social functioning during that period, especially while Catherine was stabilized on medications. Id. Finally, Catherine's limitations in

concentration, persistence, or pace arose after the date last insured, and her testimony and reports indicate that she had no troubles concentrating during the period at issue. Id. Medications controlled her symptoms, and she consistently had normal mental status examinations with no concentration, persistence, or pace deficits. Id. While not an RFC assessment, the ALJ's analysis of the domains of functioning provide important context for his RFC determination.

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. The Court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a sufficient summary and explanation of Catherine's medical records, hearing testimony, the opinion evidence, and the ALJ's conclusions. It is not for the Court to re-weigh the evidence, and I find that substantial evidence supports the ALJ's RFC determination here.

## **CONCLUSION**

For the foregoing reasons, I **RECOMMEND** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** the Commissioner's motion for summary judgment, and **DISMISSING** this case from the Court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive on the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such

objections, including the waiver of the right to appeal.

                                  Entered:  February 25, 2019

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge